IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

KEITH KENNEDY,                    :    Case No. 1:19-cv-29
                                  :
             Plaintiff,           :    Judge Matthew W. McFarland
                                  :
      v.                          :
                                  :
MOAYED HARB,                      :
                                  :
             Defendant.           :

---

## MEMORANDUM OPINION AND ORDER

---

This case is before the Court on cross motions for partial summary judgment. The plaintiff, Keith Kennedy, moves for summary judgment (Doc. 20) on breach of contract, constructive trust, declaratory judgment, and the counterclaims brought by the defendant, Moayed Harb. Harb moves for summary judgment (Doc. 25) over breach of partnership agreement and the quasi-contractual claims. For the reasons set forth before, the Court grants in part and denies in part both motions.

## FACTS

At issue are four townhomes in the Walnut Hills neighborhood in Cincinnati, and whether Kennedy has any right to any part of them.

### A. The parties discuss going in on the housing project 75%/25%.

In October 2017, Kennedy was a realtor, Harb was a dentist, and Harb had money to invest. Harb bought four townhomes located on Kenton Street (the "Kenton Street project" or "Kenton Street properties") in Walnut Hills, Cincinnati. Kennedy served as

Harb's real estate agent in the sale of the Kenton Street properties. (Doc. 19 at 16.) Harb paid the down payment and was the sole signatory on the promissory note for the acquisition and construction loan for the properties. (Doc. 19 at 36-37; Doc. 20 at 3; Docs. 27 and 32 at ¶ 5.) Harb alone made servicing payments directly to the mortgagee. (*See* Docs. 27 and 32 at ¶ 8.)

After the purchase, the two discussed becoming "partners" with respect to the Kenton Street project. (Doc. 19 at 90.) Harb testified that the discussion happened "between two friends" over dinner and a glass of wine, and continued over text messages. (*Id.* at 38.) One of those exchanges over text messaging came in October 2017. The two of them were discussing the Kenton Street project, and Harb texted Kennedy, "Perfect. You should come in as a partner. lol." (Doc. 19-2 at Page ID 278.) Kennedy also testified that the two of them were talking on the phone and Harb said, "Why don't you be a partner, you're doing all this work." (Doc. 23 at 18.) Harb asked him "how much are you thinking," and proposed that Kennedy take one house and Harb would keep three. Kennedy countered, "why don't we do it as 25/75" and Harb replied, "well, fair enough." (Doc. 19 at 37-38.) Harb admitted the two of them agreed on a percentage:

| | |
|---|---|
| Plaintiff's counsel: | And the 75/25 arrangement, that was the agreement that you guys ultimately ended up with, correct? |
| Harb: | That was the final one. We didn't change it after. |

(*Id.* at 38.)

Harb testified at length on what he understood to be the terms of their agreement. The parties agreed that Kennedy would pay 25% of the down payment and, after that,

pay 25% of the costs of the project.  (*Id.* at 36.)  Testimony established that, under the

parties' agreement, Kennedy was to pay 25% of the expenses associated with the Kenton

Street project:

> Plaintiff's counsel:  And just to be clear, the ultimate agreement that you and Keith reached was that Keith would pay 25% of the expenses on the project, and he would receive 25% of the profit on the project?
>
> Harb:  Yes.

(*Id.* at 59.)  Beyond the percentage split, Harb testified to other terms he understood to be

a part of the parties' agreement:

> Plaintiff's counsel:  So what Keith gave was 25% of the cost, of the expenses?
>
> Harb:  Yes.
>
> Plaintiff's counsel:  And what he would get back was 25% of the profit?
>
> Harb:  That was in the past, the plan in the past.
>
> Plaintiff's counsel:  That was the agreement?
>
> Harb:  That was the plan.  That was the reward between us two.
>
> Plaintiff's counsel:  Okay. So you've made it clear to Keith that he would get 25% of the profit if he paid 25% of the costs?
>
> Harb:  Yes.
>
> Plaintiff's counsel:  And he wasn't required to do any labor, so to speak, even though he volunteered to do some?
>
> Harb:  Yes.
>
> Plaintiff's counsel:  Okay. And you and Keith both accepted that agreement?

| | |
|---|---|
| Harb: | It was a word agreement, so if you want, it was a verbal agreement.  It was – it was something that we talked about, we never wrote it down on papers. |
| Plaintiff's counsel: | Okay. But you both agreed to what you talked about? |
| Harb: | Yes. |
| Plaintiff's counsel: | Okay. So other than what you've told me so far, what were the other terms that you and Keith agreed upon? |
| Harb: | I can't think of any. |
| Plaintiff's counsel: | Okay. So Keith would pay 25% of the expenses, he would get 25% of the profit; anything else? |
| Harb: | Other than a vacation award, I can't think of any right now. |

(*Id.* at 82-84.)  Kennedy agreed that the parties did not have a signed contract between

themselves.  (Doc. 23 at 27.)  Harb testified they had an "[o]ral agreement, talked about it

in text messages," such as WhatsApp, and that the share would be 75% (Harb) and 25%

(Kennedy).  (Doc. 19 at 85.)  Harb was forthright on these points:

| | |
|---|---|
| Plaintiff's counsel: | So you and Keith did agree to be partners? |
| Harb: | Yes. |
| . . . | |
| Plaintiff's counsel: | So the agreement was you would be a 75% partner, Keith would be a 25% partner? |
| Harb: | Yes. |
| Plaintiff's counsel: | You would pay 75% of the expenses, Keith would pay 25%? |
| Harb: | Yes. |

4

| | |
|---|---|
| Plaintiff's counsel: | And Keith would get 25% of the profit from the project involving the four properties and you would get 75? |
| Harb: | Yes. |
| Plaintiff's counsel: | Okay. Any other terms of the partnership agreement? |
| Harb: | No. I can't think of any except for just universally, when you have any type of relationship with a partner, there are some universal things that break a partnership or an agreement. |

(*Id.* at 90-91.) As Harb put it, "My word to him . . . was 25% in and 25% out." Harb Depo.

at 89. Or, as Harb put it again, "I'm going to honor my word [about the 75%/25% split]."

(*Id.* at 103.)

The parties also discussed forming a Limited Liability Company (LLC). (*Id.* at 23,

40; Doc. 23 at 26.) Kennedy persistently asked Harb if he had formed an LLC. Harb

called his accountant and asked him to form the LLC. (Doc. 19 at 32.) He told his

accountant that he had bought four houses and that he and Kennedy were "going to go .

. . into this project together," Harb putting forth 75% and Kennedy contributing 25%, and

both of them taking out the same percentages they had put in. (*Id.*) Harb's accountant

drafted an LLC operating agreement that would make Harb a 75% member and Kennedy

a 25% member. (*Id.* at 44.) He showed it to Keith. But the formation of the LLC stalled

after that. Kennedy never signed the operating agreement. (Docs. 27 and 32 at ¶ 15; Doc.

19 at 51; Doc. 23 at 33.)

After Harb bought the townhouses, Kennedy wired Harb 25% of the down

payment, an amount of $18,800. (Doc. 19 at 36; Doc. 23 at 34, 42, 65.) The two of them

were in regular contact about the Kenton Street project. (Doc. 19 at 58.) Harb did not

assign Kennedy any duties relating to the project and Kennedy's personal involvement

with the project was limited due to his move to England beginning in early 2018. (*Id.* at

45, 59.) Nevertheless, Kennedy involved himself in certain projects, such as fencing (Doc.

23 at 89) and deck projects (Doc. 23 at 37-39; 23-1 at Page ID 472). Harb testified that any

duties related to the project that Kennedy performed were the result of Kennedy's

volunteering. (Doc. 19 at 59.) Harb's understanding what that any duties Kennedy

performed were not part of the agreement; rather, Kennedy volunteered to do them.

Harb testified, "I did not assign to him any duties. . . . He volunteered." (*Id.* at 59; *id.* at

58, 59, 91.) But Kennedy testified, "my job to help with the remodel and the fixing of

things, and design choices on a dime so that we can make it look really good." (Doc. 23

at 42-43.) In any event, it was Harb who signed the remodeling contract. Kennedy did

not sign the contract as a party, guarantor, surety, or in any other capacity. (Docs. 27 and

32 at ¶ 10.) That remodeling contractor eventually filed a lien on one of the properties.

(Doc. 19 at 149; Doc. 23 at 77, 84.)

### B. The houses sell, the men attempt to reconcile their expenses, and they have a falling-out.

The properties were still titled in Harb's name when they were listed for sale.

(Doc. 20 at 5-6.) Denise Guiducci acted as the realtor this time. (Doc. 19 at 166-67.) Near

the end of 2018, two of the units sold. (Doc. 23 at 63.) The unit at 2346 Kenton Street sold

for $204,900.00 on November 14, 2018. (Doc. 20 at Page ID 319.) According to the closing

documents, Harb was the seller and the cash due to the seller for the sale of 2346 Kenton

Street was $85,852.82. (Doc. 23-1 at Page ID 492; *see also id.* at Page ID 489.)

On November 8, a few days before 2346 Kenton Street was to close, Harb sent

Kennedy a voice message on WhatsApp. His voice message stated the following:

> What I'm going to do is, I'm going to pay you back all your expenses . . . .
> I'm going to take all the expenses that I spent, and your expenses that you
> spent, and then it's going to go 25% on you . . . 75% on me. . . . I'm still not
> going to touch . . . the 85 that we got from the house. But I'm going to pay
> you directly from me to you [the expenses] from my regular money. And
> that way it's very easy. And then, when we get the 85, and we split that
> 75/25 . . . each one will do their . . . taxes separately. . . . Whenever you hear
> the voice message, just confirm that you agree. . . . Because I was looking
> at my notes — back in May, I did all the expenses that I spent and the things
> that you spent, and the money that we got back from rent, and the deposit,
> and then I did 75/25, and then we closed all the accounts in May. But after
> May we started new recordings. . . . So everything is just going to go divide
> 75/25.

(Doc. 20 at Exhibit 5, Audio Recording on Google Drive.) After he sent the voice message,

the 2346 Kenton Street property closed, and a month later, the 2344 Kenton Street

property closed for $203,000.00. (Doc. 20 at Page ID 320.)

Around the same time the first two properties were closing, in November or

December 2018, Kennedy and Harb attempted to reconcile their expenses to reflect their

75%/25% stakes in the project. (*See* Doc. 19 at 160.) Kennedy sent Harb all of his expenses

and receipts. Harb thought he saw some discrepancies. (*Id.* at 150.) For instance,

Kennedy told Harb he had paid $33,000 toward the down payment. But the actual

amount was $18,800. (Doc. 23 at 42; *see also* Doc. 19 at 152-53.) And, according to the

emails between the two men, Kennedy proposed that he was entitled to reimbursements

of other expenses that, upon Harb's review, differed greatly from his own calculations.

(Doc. 19 at 147-58; Doc. 19-2 at Page ID 284-286.) On December 7, 2018, Harb sent

Kennedy an email laying out his corrections to Kennedy's numbers and expressing his

concern:

> When I first met you and I knew you were a real estate agent I told you
> about my plans to invest and you said you will help. . . . You told me about
> these properties and you said you are willing just to help because we are
> good friends and you like to help. I told you I will pay you commission for
> helping and even offered a cruise after selling everything. You kept
> mentioning to be a partner. And I agreed for a 25% and really at the time I
> did not need a partner and you know how hard and much I worked to make
> this happen. I appreciate your support and help.
>
> But knowing about 27,000.00 all by coincidence that I was going to over pay
> to you????? What do you say to that. Let alone the 1000 dollars that you
> were gonna keep or the money for the decks Or saying 33,000 for
> downpayment instead of 18,000. Please don't say you could not recall.
> Let's assume you forgot those number did you forget that you kept a 1000
> in your pocket. From your friend?? . . . .
>
> I am disappointed I know you said it was all mistakes and it was my
> mistake for not keeping accounts. . . .

(Doc. 19-2 at Page ID 286 (all sic).) In the end, the parties agreed on what Kennedy would

be reimbursed for and "were done with it." (Doc. 23 at 42; Doc. 19 at 154.)

But then, around the middle of December—after the 2344 and 2346 units had

already been sold and Harb received the proceeds—Harb told Kennedy "you are not with

me in this project anymore." (Doc. 19 at 110.) The reason: Harb believed that Kennedy

had violated "moral principles." (*Id.* at 160-61.) He had issues with the discrepancies in

Kennedy's claims on what he was entitled to and Harb also claimed he had evidence that

when Kennedy went to Cincinnati, "he didn't work with the project the whole time." (*Id.*

at 161.) In Harb's view,

> [Kennedy] breached the trust . . . that we had between us, so I decided that
> he does not deserve the favor that I was paying him in return for his help.

8

> Because his help was more of time that he spent, because he has time on his hands, and there was a lot of major negligence in there. And when I asked for reasons, I just got bad excuses. . . . And I just didn't want to keep going with this, with this work with him, because it was harming me more than anyone else. . . .

(*Id.* at 111.) Furthermore, Harb testified that he does not plan on paying Kennedy 25% of the profit if or when the last two properties sell. (*Id.* at 159.)

### C. This lawsuit follows.

Kennedy brought this lawsuit in January 2019. He brings nine claims: (1) breach of partnership agreement (or, alternatively, joint venture); (2) breach of contract; (3) promissory estoppel; (4) unjust enrichment/quantum meruit; (5) constructive trust (properties); (6) constructive trust (net proceeds from sale of first two properties); (7) breach of fiduciary duty; (8) accounting; and (9) declaratory judgment. (Doc. 7.) Harb filed an answer and advanced three counterclaims for declaratory judgment, slander of title, and breach of fiduciary duty. (Doc. 11.)

After discovery, both parties moved for partial summary judgment. Kennedy seeks summary judgment on breach of contract, constructive trust (properties), and declaratory judgment, as well as all of Harb's counterclaims. (Doc. 20.) Harb moves for summary judgment on the issues of breach of partnership, promissory estoppel, and unjust enrichment/quantum meruit. (Doc. 25.)

### LAW AND ANALYSIS

### A. Legal Standard for Summary Judgment

When there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment. Fed. R.

9

Civ. P. 56(a). The burden is on the moving party to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets its burden, then it becomes the nonmoving party's responsibility to point out specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). This Court is under no obligation to plumb the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). A "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, the nonmoving party must put forward probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy*, 39 F.3d at 1347. If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

When parties file cross-motions for summary judgment, the standard remains the same. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). Resolving such cross-motions requires the Court to analyze each motion on its own merits, drawing all reasonable inferences against the party whose motion is under review. *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019).

## B. Breach of Partnership Agreement or Joint Venture

*Partnership.* The word "partner" is not talismanic. Using it to describe another person does not automatically convert someone's relationship with that person into the

legal entity known as a partnership. *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 982 (N.D. Ohio 2008). That is because, under Ohio law, the existence of a partnership depends on statutory and other specific elements. The Ohio General Assembly has defined "partnership" as "an association of two or more persons to carry on as co-owners a business for-profit formed under section 1776.22 of the Revised Code, a predecessor law, or a comparable law of another jurisdiction." R.C. 1776.01(M). R.C. § 1776.22(A) provides that "any association of two or more persons to carry on as co-owners a business for-profit forms a partnership, whether or not the persons intend to form a partnership." A "partnership agreement" can be written, oral, or implied. The partnership is "not required to execute its partnership agreement" and is bound by its partnership agreement "irrespective of whether the partnership executes the agreement." R.C. § 1776.01(N). Ohio courts hold that a partnership exists if a plaintiff establishes all of these elements:

(1) an express or implied partnership contract between the parties;

(2) the sharing of profits and losses;

(3) mutuality of agency;

(4) mutuality of control; and

(5) the co-ownership of the business and of the property used for partnership purposes or acquired with partnership funds.

*Anchor v. O'Toole*, 94 F.3d 1014, 1024 (6th Cir. 1996) (citing *Cooke v. Pointer Oil Co. of Florida*, 5th Dist. Stark No. CA 5599, 1981 WL 6439, at *9 (Oct. 14, 1981)).[1]

---

[1] Though these elements were articulated long before the General Assembly passed the Ohio Revised Code provisions concerning partnership in 2008, courts since 2008 have continued to apply this five-part test. *E.g., F.P.IP, LLC v. Hustler Cincinnati, Inc.*, 533 F. App'x 615, 619 (6th Cir. 2013); *Westbrook v. Swiatek*, 5th

Harb moves for summary judgment, arguing that Kennedy rests his case for a partnership on Harb's occasional uses of the word "partner" to describe Kennedy, but the parties' conduct does not bear the marks of a partnership under Ohio law. Kennedy responds, in largely conclusory fashion and with infrequent citations to the record, that the two men had a partnership agreement because they shared income and expenses, both could bind the partnership, and, in Kennedy's telling, both parties "agree" that they had formed a partnership. The problem with Kennedy's position is his failure to identify probative evidence that would persuade a jury to reach a verdict in his favor on the partnership claim. *See Lansing Dairy,* 39 F.3d at 1347.

Take the "sharing of profits and losses" element first. Kennedy claims that both of them shared income and expenses, pointing in the general direction of the "reconciliations" the two men made "from time to time" and during which Kennedy supposedly received 25% of the income. (*See* Doc. 33 at 3.) But at the summary judgment stage, Kennedy may no longer rely on his allegations, and he does not cite any part of the record that demonstrates he ever actually received any share of the income. *See Lansing Dairy,* 39 F.3d at 1347.

Kennedy fares no better on the "mutuality of control" element. The hallmarks of control are conclusively in Harb's favor here. Harb signed the remodeling contract. Kennedy did not sign it as a party, guarantor, surety, or in any other capacity. (Docs. 27 and 32 at ¶ 10.) That contractor filed a lien against Harb's interest. (*See* Doc. 19 at 149;

---

Dist. Delaware No. 09CAE09–0083, 2011-Ohio-781, ¶ 54. This Court will do likewise.

Doc. 23 at 77, 84.) The parties did not pay taxes as a partnership. (Docs. 27 and 32 at ¶ 13.) *See Westbrook v. Swiatek*, 5th Dist. Delaware No. 09CAE09–0083, 2011-Ohio-781, ¶ 65. And it was Harb's name that was on the title and closing documents. (Doc. 23-1 at Page ID 489, 492.)

Kennedy does not contend, much less show, that his name was on any legal document that would give him any control over the properties. Rather, Kennedy claims that he shared Harb's ability to bind the partnership, because he had the discretion to make decisions regarding expenses on the project without Harb's prior approval. Appended to this assertion is a citation to his deposition wherein he discusses the deck project. The Court can only assume that Kennedy's record citation is meant to suggest that he is referring to his ability to incur expenses related to the deck job. Construing this in Kennedy's favor as the nonmoving party, it is still insufficient evidence to demonstrate that he in fact shared mutual control over the Kenton Street project. The fact that Kennedy might have had something to do with incurring some expenses related to the project is not evidence that he had *control* over the project. Context matters. And, here, the context around those expenses dissolves the image Kennedy attempts to portray:

> Harb: [A]t some point, like around May or June, I just kept paying the mortgage, and the manager bills, and we would talk about the manager, the project, like the decks or the fence, and [Kennedy] suggested to subcontract them so we can get them quicker.
>
> And I said *if they are supervised by Quentin and he approves what is happening, we will move forward with it. . . .*
>
> So, at that point . . . he said, well, if we are short of

|  | money, I can put some expenses on my credit card. *I said, fine, but keep me posted.* |
|---|---|
| Plaintiff's counsel: | Okay. So he was authorized to incur those expenses on behalf of the project? |
| Harb: | Keep me posted, I want to know before what expenses are going out. . . . |
| Plaintiff's counsel: | But he was authorized to make purchases for the project? |
| Harb: | *If I authorized, if I say yes, if I say no, it's no.* |

(Doc. 19 at 94-95 (emphases added).) The fuller picture, then, shows that Harb was the one greenlighting expenses on projects like the deck. And, if Kennedy moved forward on an expense, he did so on Harb's terms. So, although Kennedy may have had discretion to make smaller expenses without Harb's prior knowledge, Kennedy fails to offer any evidence that might show he shared mutual control over the project.

Lastly, Kennedy cannot overcome the fact that he does not co-own with Harb any of the property related to the project. *Simons v. Buldas*, 6th Dist. Lucas No. L–15–1316, 2016-Ohio-7111, ¶ 17. He admits that Harb had the sole title to the properties from the time Harb acquired them until the time they were marketed. (Doc. 32 at ¶ 2.) His one qualification to that admission is his assertion that he *did* have an ownership interest in the properties, by virtue of their partnership—but co-ownership is an element of partnership, so it is circular to argue that he co-owns the property because he is Harb's partner. Because Kennedy offers no evidence that he shares any co-ownership interest in any property with Harb, he loses on that element as well.

Harb has put forward evidence that no partnership exists and Kennedy has not

shown any genuine issue for trial on the partnership issue. For that reason, the Court finds that there is no partnership agreement and grants summary judgment for Harb.

*Joint venture.* Kennedy also argues, in the alternative, that the parties had a joint venture agreement. A joint venture is "a partnership for the purposes of a single business enterprise." *Anchor*, 94 F.3d at 1024 (citing *L & H Leasing Co. v. Dutton*, 82 Ohio App.3d 528, 612 N.E.2d 787, 790 (3d Dist. 1992)). A plaintiff proves that a joint venture exists by establishing all of these elements:

(1) a joint contract;

(2) an intention to associate as joint venturers;

(3) community of interest and control, including contributions to the joint venture;

(4) the mutual right to direct and control the purpose of the joint venture; and

(5) an agreement for the division of profits and losses.

*Id.* "As with proving the existence of a partnership relationship, all the elements of a joint venture must also be established with credible evidence to sustain a motion for directed verdict or for summary judgment." *Id.* Each party must have an express or implied authority to bind the other in the joint business. *Berger v. Dare*, 99 Ohio App. 3d 103, 106, 649 N.E.2d 1316 (12th Dist.1994).

The "direct and control" element disposes of this issue in Harb's favor. For the same reasons expressed regarding the "mutual control" element in the partnership analysis above, Kennedy fails to offer evidence that would persuade a jury that the two men shared a mutual right to direct and control the purpose of the joint business. There were aspects of the project that required Harb's authorization. So Kennedy did not direct

15

and control all aspects of the Kenton Street project. *Clifton v. Van Dresser Corp.*, 73 Ohio App. 3d 202, 211, 596 N.E.2d 1075 (6th Dist.1991) (citing *Bloom v. Leach*, 120 Ohio St. 239, 244, 166 N.E. 137 (1929)) ("A joint venture exists where each party to an enterprise can direct and control all aspects of the enterprise."). For that reason, the Court grants summary judgment to Harb on the joint venture issue.

## C. Breach of Contract

Kennedy moves for summary judgment on his breach of contract claim. He claims the facts clearly establish all the elements to a breach of contract. He also maintains that Harb committed an anticipatory repudiation as to the other two townhomes that have not yet sold, based on Harb's testimony that he was not going to pay Kennedy out of the prospective proceeds related to those properties.

To prove a breach of contract under Ohio law, a plaintiff must establish (1) the existence of a valid contract, (2) performance of contractual obligations by the plaintiff, (3) breach by the defendant, and (4) damage or loss to the plaintiff. *Garofalo v. Chicago Title Ins. Co.*, 104 Ohio App. 3d 95, 108, 661 N.E.2d 218 (8th Dist.1995) (citing *Natl. City Bank v. Erskine & Sons*, 158 Ohio St. 450 (1953)). A valid contract requires an offer, acceptance, the manifestation of mutual assent, and consideration. *Kostelnik v. Helper*, 96 Ohio St. 3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 17. There must be a meeting of the minds on the essential terms and the contract must be definite and certain. *Episcopal Ret. Homes, Inc. v. Ohio Dep't of Indus. Relations*, 61 Ohio St. 3d 366, 369, 575 N.E.2d 134 (1991). "Terms of an oral contract may be determined from 'words, deeds, acts, and silence of the parties.'" *Res. Title Agency, Inc. v. Morreale Real Estate Servs., Inc.*, 314 F. Supp. 2d 763, 769

(N.D. Ohio 2004) (quoting *Kostelnik*, 96 Ohio St.3d at 3).

Begin with whether a valid contract exists. Harb takes the position that, if there was any "contract," it would have had to be a partnership agreement. (Doc. 29 at 15.) Not necessarily. Harb conflates the breach of contract and partnership analyses. A partnership agreement exists in the context of a partnership, R.C. 1776.01(N), and a partnership is a legal entity, R.C. 1776.21(A). A contract is simply an agreement between two or more people to do or not do something. *Smith v. Goddard*, 1 Ohio 178 (1823). In other words, one is not always the other. If there is no partnership, that does not mean there is no breach of contract. A contract may exist outside of the context of a partnership.

Here, although Harb in effect makes no defense against Kennedy's claim that the parties had a contract, the record leaves questions open as to whether the parties had a valid contract, namely with respect to whether the parties had mutual assent or a meeting of the minds. "Mutual assent" or "a meeting of the minds" means that both parties have reached an agreement on the contract's essential terms. *Specialty Executives, Inc. v. KDH Def. Sys., Inc.*, 93 N.E.3d 114, 2017-Ohio-4399, ¶ 45 (5th Dist.). Kennedy and Harb seem to have different ideas as to what exactly the essential terms of the contract were, particularly regarding Kennedy's obligations. Kennedy testified that his job "was to help with the remodel and the fixing of things, and design choices on a dime so that we can make it look really good." (Doc. 23 at 42-43.) But Harb testified that Kennedy's only obligation was to pay 25% of the expenses and that any extra work Kennedy put in was volunteered. (Doc. 19 at 58-59, 90-91.) Then again, Harb also testified that Kennedy's "help was more of time that he spent, because he has time on his hands, and there was a

lot of major negligence in there." (Doc. 19 at 111 (sic).) Mutual assent on the contract's essential terms, therefore, does not clearly come through on this record.

Though the above finding suffices to deny summary judgment, the Court notes that, on the second element—whether Kennedy has shown that he performed his contractual obligations—Kennedy has not carried his burden of conclusively showing that no genuine fact issue remains. He makes only passing reference to his own performance under the contract. He argues, without clear citation to the record, that Harb "concedes" that Kennedy paid 25% of the expenses, and also refers to the parties' efforts in May 2018 to reconcile their expenses. (Doc. 20 at 13.)

Neither of those assertions satisfies the evidentiary showing necessary to remove this question from a jury. First, Harb disputes, albeit also in cursory fashion, that Kennedy paid the full 25% of the expenses. He asserts that Kennedy only paid a "tiny fraction" of the overall expenses and "nothing approaching 25%." (Doc. 29 at 6. *See also* Doc. 30 at ¶ 4.) So their testimonies contradict each other. The fact of whether Kennedy performed his obligations under the contract is material. So there is a clear dispute that precludes summary judgment. Second, the parties' reconciliation in May 2018 hardly suffices to show that Kennedy fully performed under the contract. For starters, it is hard to make sense of what is happening on the pages constituting what is apparently the parties' attempt to reconcile their expenses in May 2018. (*See* Doc. 20-1, 20-2, at Page ID 309-14.) But more importantly, the project proceeded to incur expenses after May 2018, so what they did in May 2018 does not prove that Kennedy fully performed his contractual obligations.

18

The question of Kennedy's performance disposes of his anticipatory repudiation argument, as well. When an alleged anticipatory breach occurs, the injured party can either treat the contract as terminated and sue for damages, or continue with the contract and sue for damages after the time for performance has passed. *Se. Land Dev., Ltd. v. Primrose Mgt. L.L.C.*, 193 Ohio App. 3d 465, 2011-Ohio-2341, 952 N.E.2d 563, ¶ 11 (3d Dist.). But if he chooses to continue with the contract instead of terminating it, he must perform all the conditions he is obliged to perform under the contract. *Roehm v. Horst*, 178 U.S. 1, 11 (1900); *Hettrick Mfg. Co. v. Waxahachie Cotton Mills*, 1 F.2d 913, 919 (6th Cir. 1924). It may be an old rule, but it's still a valid one. *Se. Land Dev.*, 193 Ohio App. 3d 465, 2011-Ohio-2341, ¶ 11. And, since there is a factual question as to Kennedy's performance, this rule forecloses summary judgment on the alleged anticipatory breach of contract regarding the unsold properties.

Because questions of material fact surround the breach of contract issue, the Court cannot find that Kennedy is entitled to judgment as a matter of law. For that reason, it denies summary judgment on the breach of contract claim.

### D. Constructive Trust (Properties)

Kennedy moves for summary judgment on the constructive trust (properties) claim. A constructive trust is typically a remedy to unjust enrichment. *Ferguson v. Owens*, 9 Ohio St. 3d 223, 226, 459 N.E.2d 1293, 1295 (1984). It's usually invoked when someone has acquired property through fraud. *Id.* But it may also be imposed "where it is against the principles of equity that the property be retained by a certain person even though the property was acquired without fraud." *Id.* "The party seeking to have a constructive

19

trust imposed bears the burden of proof by clear and convincing evidence." *Estate of Cowling v. Estate of Cowling*, 109 Ohio St. 3d 276, 2006-Ohio-2418, 847 N.E.2d 405, ¶ 20.

Kennedy argues that, since (in his view) Harb breached the contract and disregarded the alleged partnership agreement, this Court should impose a constructive trust awarding him an undivided 25% interest in the properties located at 2340 and 2342 Kenton Street. He says Harb tricked him into investing money and working on the project.

There are just too many factual issues still at play for the Court, instead of a jury, to decide whether Kennedy is right as a matter of law. Kennedy has not conclusively shown that Harb defrauded or "tricked" him or that Harb's actions violate the principles of equity. Since the Court has found that there was no partnership as a matter of law; and since fact issues preclude summary judgment on the breach of contract claim; and since Kennedy has not shown by clear and convincing evidence that Harb violated principles of equity; and since Kennedy's constructive trust argument depends on at least one of those claims; the Court declines to enter summary judgment on the constructive trust (properties) claim.

### E.  Quasi-Contract Claims

Harb moves for summary judgment on Kennedy's claims for unjust enrichment/quantum meruit/promissory estoppel.

*Unjust enrichment/Quantum meruit.* The elements of claims for unjust enrichment and quantum meruit are identical. The difference is the way damages are calculated. The plaintiff must show that (1) he conferred a benefit upon the defendant; (2) the defendant

20

had knowledge of the benefit; and (3) the defendant retained the benefit under circumstances where it would be unjust to do so without payment. *A N Bros. Corp. v. Total Quality Logistics, L.L.C.*, 59 N.E.3d 758, 2016-Ohio-549, ¶ 42 (12th Dist.). "Unjust enrichment occurs when a person has and retains money or benefits that in justice and equity belong to another." *Hillier v. Fifth Third Bank*, 154 N.E.3d 1266, 2020-Ohio-3679, ¶ 71 (2d Dist.).

Harb does not dispute that Kennedy conferred a benefit upon him or that he knew about the benefit. Instead, he claims that it is a fatal fact for Kennedy that Kennedy accepted payment for the services he rendered and "additional money." (Doc. 20 at 18.) Harb does not specify what that "additional money" was. The problem with Harb's position is that he does not conclusively show that he did not retain the benefits under circumstances where it would be unjust to do so without payment. Kennedy shows that he lent his real estate expertise, paid 25% of the down payment, paid at least some of the expenses, and supervised and facilitated work on the project. Harb does not show in reply that he withheld just payment for these benefits. Nor does he show that the payment Kennedy received was fair. Vague references to Kennedy's receipt of payment for his services and "additional money" do not support his contention that whatever Kennedy received from Harb represents fair payment for all the benefits Kennedy conferred upon him. He testified that he paid Kennedy $3,000 and that it "wasn't based on anything." (Doc. 19 at 122, 156.) If the $3,000 sum was not based on anything, the Court can hardly be sure that it was based on justice and equity. *Hillier*, 154 N.E.3d 1266, 2020-Ohio-3679, ¶ 71. As it is, Kennedy has put forth enough to show that Harb may

have retained money that is not his. *Id.* So there are fact issues that remain to be resolved.

*Promissory estoppel.* To prove a claim for promissory estoppel, a plaintiff must show that (1) a clear and unambiguous promise was made; (2) it would be reasonable and foreseeable for the party to rely on that promise; (3) the plaintiff actually relied on the promise; and (4) the plaintiff was injured due to his reliance. *A N Bros. Corp.*, 59 N.E.3d 758, 2016-Ohio-549, ¶ 32.

Harb states that it is "difficult to fathom" what detrimental reliance damages Kennedy incurred that Harb has not already compensated, citing Kennedy's testimony that the two of them, when attempting to reconcile their expenses, "agreed, or agreed to disagree on certain things [regarding expenses on the project] and were done with it." (Doc. 23 at 42.) Kennedy responds by pointing to Harb's testimony: "My word to him . . . was 25% in and 25% out." (Doc. 19 at 89.) Harb appears to abandon his argument on promissory estoppel in his reply.

Kennedy is correct that a jury could find that such a promise could reasonably and foreseeably induce him to rely on its fulfillment. As Harb said elsewhere, "I'm going to honor my word [about the 75%/25% split]." (Doc. 19 at 103.) Because Kennedy has put forth probative evidence on which a jury could return a verdict in his favor, the Court denies summary judgment on the promissory estoppel issue.

## F. Declaratory Judgment

Kennedy brought a claim for declaratory judgment, asking the Court to find that, under Ohio law, he and Harb formed a partnership, or, alternatively, a joint venture. (Doc. 7 at ¶¶ 81-83.) Harb counterclaimed for declaratory judgment, asking the Court to

find that the parties did *not* form a partnership or joint venture.  (Doc. 11 at ¶ 49.) Kennedy has moved for summary judgment on both of the declaratory judgment claims. But, because the Court has already found that there was no partnership as a matter of Ohio law, it follows that it must also deny summary judgment on the related declaratory judgment claim.

Although Harb did not move for summary judgment on his declaratory judgment counterclaim, the Court will enter summary judgment in Harb's favor because the matter is settled.  A court may enter summary judgment sua sponte in favor of a nonmoving party so long as the losing party was on notice to present all desired evidence on the matter at issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); *Salehpour v. Univ. of Tennessee*, 159 F.3d 199, 204 (6th Cir. 1998); *QSI Holdings, Inc. v. Alford*, 382 B.R. 731, 736 (W.D. Mich. 2007), *aff'd sub nom. In re QSI Holdings, Inc.*, 571 F.3d 545 (6th Cir. 2009).

Here, the declaratory judgment claim and counterclaim both hinge on the existence or nonexistence of a partnership.  Kennedy's declaratory judgment position is essentially an argument that a partnership exists under Ohio law.  Harb moved for summary judgment on the partnership claim and Kennedy responded to it in opposition. The parties have briefed the issue extensively and  Kennedy was clearly on notice that he needed to submit all of his evidence related to the partnership issue.  *Bay v. Clermont Cty. Sheriff's Dep't*, No. 1:08-CV-376, 2010 WL 5014226, at *8 (S.D. Ohio Nov. 3, 2010), *report and recommendation adopted*, No. 1:08CV376, 2010 WL 4976728 (S.D. Ohio Dec. 1, 2010). The Court has found that, as a matter of law, there was no partnership, joint venture, or limited liability company.  The grounds for granting summary judgment to Harb on

partnership apply equally to the declaratory judgment claim and counterclaim, since they hang on whether there was a partnership. *Milner v. Biggs*, No. 2:10-CV-904, 2012 WL 1188274, at *17 (S.D. Ohio Apr. 6, 2012), *aff'd*, 522 F. App'x 287 (6th Cir. 2013). Since the record makes clear that there was no partnership, joint venture, or limited liability company, the Court will deny summary judgment for Kennedy and enter summary judgment sua sponte on Harb's counterclaim for declaratory judgment.

### G. Slander of Title

Kennedy seeks summary judgment on Harb's counterclaim for slander of title. Harb alleges that Kennedy published statements that constitute slanderous statements against Harb's title to the unsold properties on Kenton Street. He does not point to any other statements besides those in the complaint. (Doc. 11 at ¶¶ 50-61.)

Slander of title is an action "against any one who falsely and maliciously defames the property, either real or personal, of another, and thereby causes him some special pecuniary damage or loss." *Buehrer v. Provident Mut. Life Ins. Co. of Philadelphia*, 37 Ohio App. 250, 256, 174 N.E. 597, 599 (1930), *aff'd sub nom. Buehrer v. Provident Mut. Life Ins. Co.*, 123 Ohio St. 264, 175 N.E. 25 (1931). "To prevail, a claimant must prove '(1) there was a publication of a slanderous statement disparaging claimant's title; (2) the statement was false; (3) the statement was made with malice or made with reckless disregard of its falsity; and (4) the statement caused actual or special damages.'" *Green v. Lemarr*, 139 Ohio App. 3d 414, 430–31, 744 N.E.2d 212, 224 (2d Dist.2000) (citation omitted). Relevant here, "court filings are privileged from any tort action, and no slander of title claim can be based merely upon allegations in a complaint and filings, even if later found to be

24

unsupported." *Whitman v. Gerson*, 1st Dist. Hamilton No. C-140592, 2016-Ohio-311, ¶ 29.
*See also Surace v. Wuliger*, 25 Ohio St. 3d 229, 495 N.E.2d 939, 940 (1986), first paragraph of
syllabus ("As a matter of public policy, under the doctrine of absolute privilege in a
judicial proceeding, a claim alleging that a defamatory statement was made in a written
pleading does not state a cause of action where the allegedly defamatory statement bears
some reasonable relation to the judicial proceeding in which it appears.").

Harb points to nothing beyond the allegations in the complaint to support his
slander of title counterclaim. Since he cannot support a slander of title claim based only
on allegations in court filings, Kennedy is entitled to summary judgment. *Whitman*, 2016-
Ohio-311, ¶ 29.

### H. Breach of Fiduciary Duty

Kennedy also moves for summary judgment for Harb's counterclaim for breach of
fiduciary duty as a real estate agent.

The fiduciary duties of a real estate agent are laid out in R.C. 4735.62. The
fiduciary, "[i]n representing any client in an agency or subagency relationship . . . shall
use [his] best efforts to further the interest of the client," enumerating several duties the
fiduciary must undertake. R.C. 4735.62. An "agency" or "agency relationship" is "a
relationship in which a licensee [real estate broker, see R.C. 4735.01(EE)] represents
another person in a real estate transaction." R.C. 4735.51(A). "Subagency" or "subagency
relationship" mean "an agency relationship in which a licensee [real estate broker] acts
for another licensee in performing duties for the client of that licensee." R.C. 4735.51(L).
A "client" is someone "who has entered into an agency relationship with a licensee." R.C.

4735.51(E).

Kennedy argues that, for the sale of the Kenton Street properties, he did not act as Harb's realtor—Denise Guiducci did. For that reason, Kennedy claims, he was not representing Harb in an agency or subagency relationship.

Harb points out that, even though Guiducci was the realtor facilitating the second sale of the Kenton Street properties, that did not stop Kennedy from collecting a real estate commission on the sale of the first property in November 2018. (Doc. 23 at 103-04.) In Harb's view, Kennedy cannot claim he was entitled to a real estate commission and, at the same time, claim he was exempt from fiduciary duties imposed on real estate agents under R.C. 4735.62 and .63.

Harb makes a fair point. Kennedy replies that what he received was not a commission, but a "referral fee." (Doc. 33 at 14.) That is not what he said in his deposition, though. The question was whether he received a commission, and he said he did. The uncertain nature of the relationship between Harb and Kennedy leaves open the possibility that Kennedy owed Harb the fiduciary duties of a real estate licensee. Fact issues restrict this Court from entering summary judgment on the fiduciary breach counterclaim.

For these reasons, the Court denies summary judgment on Harb's counterclaim for breach of fiduciary duty.

## CONCLUSION

Based on the above analysis, the Court **GRANTS IN PART** and **DENIES IN PART** both parties' partial motions for summary judgment and orders the following:

26

(1) The Court **GRANTS** summary judgment for Harb on Count 1, breach of partnership agreement or, alternatively, joint venture.

(2) The Court **DENIES** summary judgment for Kennedy on Count 2, breach of contract.

(3) The Court **DENIES** summary judgment for Harb on Count 3, promissory estoppel.

(4) The Court **DENIES** summary judgment for Harb on Count 4, unjust enrichment/quantum meruit.

(5) The Court **DENIES** summary judgment for Kennedy on Count 5, constructive trust (properties).

(6) The Court **DENIES** summary judgment for Kennedy on Count 9, declaratory judgment, and **ENTERS SUMMARY JUDGMENT** for Harb on Counterclaim 1, declaratory judgment.

(7) The Court **GRANTS** summary judgment for Kennedy on Counterclaim 2, slander of title.

(8) The Court **DENIES** summary judgment for Kennedy on Counterclaim 3, breach of fiduciary duty.

(9) This matter shall proceed on Counts 2 (breach of contract), 3 (promissory estoppel), 4 (unjust enrichment/quantum meruit), 5 (constructive trust, properties), 6 (constructive trust, net proceeds from sale of first two properties), 7 (breach of fiduciary duty), and 8 (accounting), and Counterclaim 3 (breach of fiduciary duty).

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____

JUDGE MATTHEW W. McFARLAND